In the Interest of B.B.M., A Minor Child,

S.M., Maternal Grandfather, and V.M.,
Maternal Grandmother,
Appellants.

No. 93–786.

Supreme Court of Iowa.

March 23, 1994.

As Corrected March 25, 1994.

As Amended on Denial of
Rehearing April 14, 1994.

Norman L. Springer, Jr., of Robak & Springer, Council Bluffs, for appellants.

John M. Trewet, of Kluever, VanGinkel & Trewet, Atlantic, guardian and custodian.

TERNUS, Justice.

In this case we decide whether grandparents may intervene in a chapter 600A termination of parental rights proceeding for purposes of seeking to adopt their grandchild. The juvenile court ruled that the grandparents could not intervene and dismissed their petition. Based on the unusual circumstances of this case, we reverse. ·

B.B.M. was born in January 1993. Shortly after his birth, his unmarried parents, B.M.M. and D.F.J., signed releases of custody and consents to termination of their parental rights. Custody was released to an attorney, Kathleen Schomer Kohorst, for purposes of adoption by a couple the parents had met and approved. Kohorst began this action by filing a petition for termination of parental rights under Iowa Code chapter 600A (1993).

In late January 1993, the court terminated the parental rights of B.M.M. and D.F.J. and appointed Kohorst as the child's guardian and custodian. Two weeks later Kohorst requested that the court appoint attorney John M. Trewet as the new guardian and custodian. She informed the court that the potential adoptive parents had decided not to adopt the child because they learned the child might have Duchenne muscular dystrophy (DMD). (DMD is a hereditary disease passed primarily to male children from a "carrier" mother.) The court appointed Trewet as the guardian and custodian of the child ˙to facilitate a private adoption.

One month later, the maternal grandparents of B.B.M., V.M. and S.M., filed a petition of intervention. The grandparents intervened for the purpose of adopting B.B.M. and requested that the physical custody of B.B.M. be transferred to them pending adoption.

The guardian filed a motion to dismiss the petition to intervene arguing that the petition was untimely and that the grandparents were not proper parties for intervention. The district court concluded that the grandparents' rights were terminated with the natural parents' parental rights and granted the motion to dismiss. The grandparents appeal this ruling.

Our review of a denial of intervention is on error. *In re Estate of DeVoss*, 474 N.W.2d 539, 541 (Iowa 1991). However, even though review is on error, the trial court is accorded a certain amount of discretion to deny intervention in proper cases. *Id.*

I. *Timeliness of Petition to Intervene.*

The guardian first claims that the petition to intervene was untimely. Iowa Rule of Civil Procedure 75 states:

Any person interested in the subject matter of the litigation, or the success of either party to the action, or against both parties, may intervene at any time before trial begins, by joining with plaintiff or defendant or claiming adversely to both.

The guardian argues that the petition was not filed "before trial begins" because it was filed after the court had ruled on the petition for termination of parental rights. Our court has never addressed this precise issue, but the court of appeals did in *In re C.L.C.*, 479 N.W.2d 340 (Iowa App.1991).

In *C.L.C.*, Mia and Scott Bartels intervened in a termination proceeding so they could seek to be appointed guardians and eventually adopt the children who were the subject of the termination proceeding. They filed their petition of intervention after ter-

mination orders had been entered. The court of appeals rejected an argument that the petition was untimely under rule 75.

Because we agree with the reasoning of the court, we quote from its decision:

> The Bartels never desired to intervene on the issue of whether to terminate the parental rights of the children's natural parents. Rather, they seek to be heard on the issue of guardianship and custody of the children. The fact that temporary placement of the child should be done as near as contemporaneously as possible to the time in which the parental rights are terminated does not transform a proceeding to terminate parental rights into a final judgment on the matter of guardianship and custody. We find the complete difference in nature of these issues requires this court to consider the determination of each as two separate proceedings.
>
> . . . .
>
> . . . The timeliness of the Bartels' petition is therefore measured by the advent of those proceedings to which they have expressed a desire to be heard. We find the Bartels' petition to intervene prior to the proceedings on the permanency plan for these children to be timely.

*In re C.L.C.*, 479 N.W.2d at 344–45.

The court of appeals' analysis in *C.L.C.* is sound and we apply it to our case. The grandparents here do not seek to intervene on the issue of termination of parental rights. Rather, they only desire to be heard on the issue of guardianship and custody, a matter over which the court still has jurisdiction. *See* Iowa Code § 600A.9(2) (1993) ("[T]he juvenile court shall retain jurisdiction to change a guardian or custodian. . . ."). Because the issue of guardianship and custody has not been finalized, we hold that the petition to intervene was timely.

II. *Grandparents as Interested Parties.*

■ One is "interested" under rule 75 if one has a legal right that the proceeding will directly affect. *In re J.R.*, 315 N.W.2d 750, 752 (Iowa 1982). We have held that a legal right to be considered as guardian and custodian is an interest sufficient to support inter-

vention under rule 75. *Id.* However, a mere interest in adopting the child does not give one a legal right to be considered for these positions. *In re C.L.C.*, 479 N.W.2d at 344. If an interest in adopting the child were sufficient, there would be no limit to the number of people who could intervene. Consequently, we examine whether the grandparents have a legal right to be considered for appointment as B.B.M.'s guardians and custodians on some basis other than their desire to adopt their grandchild.

■ In their petition of intervention, the grandparents stated two reasons that they qualified as interested persons. First they contended that the preservation of the family relationship between them and B.B.M. was important to B.B.M.'s best interests. Secondly, the grandparents asserted that their intervention and adoption of B.B.M. would be in the best interests of the child because if B.B.M. has Duchenne muscular dystrophy, they are in a good position to care for him. Their fifteen-year-old son suffers from DMD. Consequently, they have experience with the disease and their home is equipped to accommodate the needs of a child with DMD.

Moreover, the grandparents claim that their availability may prove essential in treatment of B.B.M.'s disease. Medical scientists are investigating a possible cure or treatment for DMD through myoblast transfers, a procedure which involves transferring healthy genes from a close blood relative into the affected child. George Karpati, M.D., et al., *Myoblast Transfer in Duchenne Muscular Dystrophy*, 34 Annals of Neurology 8 (1993). If the grandparents adopted B.B.M., they would be available as potential donors for treatment of B.B.M.'s disease.

Before we explore the viability of the grandparents' claims of interest, it is helpful to review the statutory framework in which we undertake our analysis. This proceeding was brought under chapter 600A which provides for termination of parental rights where the parents have given their express consent or have by their conduct indicated no desire to continue the parent-child relationship. *See* Iowa Code § 600A.8 (1993). That chapter provides that upon termination of parental rights, "[t]he juvenile court shall

appoint a guardian and a custodian or a guardian only." *Id.* § 600A.9(1)(b). The statute does not specify who may be considered for this responsibility.

A comparison of chapter 600A with Iowa Code chapter 232 (1993) is helpful in understanding chapter 600A. Chapter 232 provides for termination of parental rights where the child who is the subject of the proceeding has previously been adjudicated a child in need of assistance. *See id.* § 232.-109. Under chapter 232, as in chapter 600A proceedings, the juvenile court must appoint a guardian and custodian upon termination of parental rights. *Id.* § 232.117(3). However, chapter 232, unlike chapter 600A, specifies that a "relative" may be appointed as the guardian or custodian. *Id.*

■ Because chapter 600A does not specifically provide that a relative may be chosen as the guardian or custodian, that statute does not give the grandparents a legal right to be considered as potential guardians and custodians in proceedings brought under chapter 600A.[1] On the other hand, chapter 600A does not say that grandparents cannot be considered as possible guardians or custodians. Therefore, the mere fact that the intervenors are the child's grandparents does not automatically disqualify them from consideration.

Because chapter 600A neither entitles the grandparents to consideration for appointment as guardians and custodians nor disqualifies them from such an appointment, we examine the nature of voluntary termination proceedings and the facts of this case to decide whether the grandparents may intervene. We undertake this examination keeping in mind that under chapter 600A, the welfare of the child is the paramount consideration. *Id.* § 600A.1. In addition, we must give due consideration to the interests of the

parents. *Id.* Significantly, chapter 600A does not require us to consider the interests of grandparents or other family members.

■ A. *Family relationship.* The grandparents assert that the desire to maintain the familial relationship gives them the right to intervene. The district court held that there was no longer any family relationship to preserve because the parents' rights and the grandparents' rights were terminated in the termination orders. This conclusion is substantially correct.

In *In re Adoption of Gardiner,* 287 N.W.2d 555, 558 (Iowa 1980), we held that when *adoption* terminates the rights of the natural parents, the grandparents' rights also end. Our later cases have modified *Gardiner* slightly to recognize that court-ordered grandparent visitation survives a stepparent adoption. *Patterson v. Keleher,* 365 N.W.2d 22 (Iowa 1985); *In re Guardianship & Conservatorship of Ankeney,* 360 N.W.2d 733 (Iowa 1985).

Since we are not dealing with a stepparent adoption or grandparent visitation rights here, the *Gardiner* rule applies. Although the present case differs from *Gardiner* because adoption of B.B.M. has not yet occurred, we think the analysis is still the same. *See In re J.M.W.,* 492 N.W.2d 686 (Iowa 1992).

In *J.M.W.,* we applied the holding of *Gardiner* to a case where the parental rights had been terminated but the children had not yet been adopted. There the grandparents intervened in a termination proceeding for the same reasons that the grandparents have intervened here—they wanted to be appointed guardians of their grandchildren and eventually be allowed to adopt the children. Although no one questioned the grandparents' right to intervene, their suitability as adoptive parents was considered by our court

---

1. We disavow any contrary holding in *In re J.R.,* 315 N.W.2d 750, 752 (Iowa 1982). In that case, a petition for termination of parental rights was brought under both chapter 232 and chapter 600A, even though the children in question had been previously adjudicated children in need of assistance. Since that case, we have clearly distinguished between a voluntary termination of parental rights under chapter 600A and a termination of parental rights under chapter 232

where the child has been adjudicated a child in need of assistance. *In re H.J.E.,* 359 N.W.2d 471, 474 (Iowa 1984) (chapter 600A and chapter 232 "create separate and distinct causes of action having different applicability based upon the facts of the case"). Our decision today merely confirms the differences between chapter 600A and chapter 232 which have been recognized since our decision in the *J.R.* case.

in its de novo review. We held that the prior termination of parental rights based on parental disqualification "substantially diminishe[d] the role of the grandparent-grandchild relationship," citing *Gardiner. In re J.M.W.*, 492 N.W.2d at 690. Nevertheless, we did not go so far in *J.M.W.* as to hold that this fact alone disqualified the grandparents as adoptive parents. It was unnecessary to reach this issue because there were other factors that heavily favored the "strangers" seeking to adopt the children over the grandparents. *Id.*

Here we have a voluntary termination of parental rights. As a result, there is even more reason to apply the holding in *Gardiner* than there was to apply it to the involuntary termination in *J.M.W.*

The parents of B.B.M. voluntarily relinquished custody and their parental rights so that their child could be placed for an independent adoption. Despite the obvious interest of the maternal grandparents in raising their grandson, their daughter chose instead to give herself and her son a completely fresh start by facilitating B.B.M.'s adoption by nonrelatives. *See In re Benavidez*, 52 Ill.App.3d 626, 10 Ill.Dec. 362, 365, 367 N.E.2d 971, 974 (1977) (wishes of mother giving consent to nonrelative adoption "can legitimately be taken into account"). In *Kasper v. Nordfelt*, 815 P.2d 747, 749 (Utah App.1991), the Utah court held in a situation similar to that involved here:

Although the *Wilson* court opined that under some circumstances family relationships might be of such a nature that [grandparents'] application to adopt should be given consideration, ... we do not find such a circumstance here, where the only living parent of the child deliberately and thoughtfully decided to place the child for adoption with an agency, and not with the paternal grandparents. We think the integrity of such a decision, involving a critically important parental right, must be preserved, not only for the stability and well-being of the child, but also for the protection of the adoption process and its purposes.

*Kasper*, 815 P.2d at 747; *accord In re Peter L.*, 59 N.Y.2d 513, 466 N.Y.S.2d 251, 453 N.E.2d 480, 482 (1983) (recognition of right in grandmother to adopt grandchild where mother voluntarily surrendered child to agency for adoption would undermine mother's decision).

We agree with the foregoing authorities. Under the circumstances here, the grandparents' adoption of their grandson is not necessarily in the child's best interest. B.B.M. has been in the custody of nonfamily members since his birth. His grandparents are strangers to him. Consequently, the blood relationship that exists has not developed into bonds of affection. Just as importantly, B.B.M. would grow up knowing his natural mother, the person who rejected him, with all the emotional confusion inherent in such a situation. Adoption by the grandparents would also be contrary to the interests of the parents who have shown their desire for a nonrelative adoption.

To allow grandparents to intervene where parents have voluntarily placed their child for an independent adoption and where no substantial relationship has been previously established between the grandparents and the child would be to elevate the grandparents' interests above the interests of the parents and most significantly, above the interests of the child. *See Suster v. Arkansas Dep't of Human Servs.*, 314 Ark. 92, 858 S.W.2d 122, 124 (1993) (" 'To create new, enforceable rights in grandparents could lead to results that would burden rather than enhance the welfare of children.' " (quoting *Cox v. Stayton*, 273 Ark. 298, 619 S.W.2d 617, 621 (1981))). Allowing intervention would give grandparents a veto power over the adoption decision of the natural parent. *See In re Peter L.*, 466 N.Y.S.2d at 254, 453 N.E.2d at 483 (grandparent does not have right to override decision of natural parent to surrender child to public agency for adoption). Chapter 600A confers no right on grandparents to have their interests assume such priority.

Finally, recognizing a right of grandparents to intervene in voluntary termination actions would delay and disrupt the adoption process. *In re Benavidez*, 10 Ill.Dec. at 366, 367 N.E.2d at 975; *In re Peter L.*, 466 N.Y.S.2d at 253, 453 N.E.2d at 482. The financial and emotional toll exacted by a pro-

tracted custody battle with grandparents would discourage most adoptive parents from coming forward. *See Suster*, 858 S.W.2d at 124; *Kasper*, 815 P.2d at 749 (recognition of grandparents' right to custody would " 'make the placement of children difficult if not entirely impractical' " (quoting *Wilson v. Family Servs. Div.*, 554 P.2d 227, 229 (Utah 1976))). In fact, the guardian here has delayed an adoptive placement because of the risk of uprooting the child if the grandparents are successful.

We hold that grandparents do not have a right to intervene in a termination of rights proceeding or adoption proceeding where the natural parents have agreed to relinquish their parental rights. *Hayes v. Watkins,* 163 Ga.App. 589, 295 S.E.2d 556, 557 (1982) (grandparents have no right to intervene in adoption proceeding where at least one natural parent is alive and has consented); *In re Benavidez,* 10 Ill.Dec. at 366, 367 N.E.2d at 975 (grandparents not allowed to intervene because they had no legal right to be preferred as adoptive parents); *Christian Placement Serv. v. Gordon,* 102 N.M. 465, 697 P.2d 148, 155 (App.1985) (grandmother not allowed to intervene where only living parent had consented to adoption through agency and grandmother had no prior relationship with the child); *Kasper,* 815 P.2d at 749 (grandparents could not intervene where only living parent had requested anonymous and confidential adoption). In this situation the grandparents have no interest to assert that is entitled to legal protection.

This conclusion is consistent with our statutory law. The legislature has not recognized grandparents' rights to visitation in voluntary termination matters,[2] has not required that the consent of grandparents be obtained prior to adoption and has not required that grandparents be given notice of termination proceedings or adoption proceedings. *See* Iowa Code §§ 598.35, 600.7, 600.-11, 600A.6 (1993). The legislature chose not to grant the grandparents any legal rights in voluntary termination proceedings. We also decline to do so. *See Murphy v. McCarthy,*

201 Ga.App. 101, 410 S.E.2d 198 (1991) (grandparents not allowed to intervene where no statute recognized their rights in cases involving voluntary termination of parental rights); *In re Brandon S.S.,* 179 Wis.2d 114, 507 N.W.2d 94, 106 (1993) (grandparents were not allowed to intervene in termination and adoption proceeding where legislature made no provision in relevant statutes for grandparents' participation in these proceedings).

We believe this case is distinguishable from *In re J.R.,* 315 N.W.2d 750 (Iowa 1982), where we permitted the grandparents to intervene. There the parents' rights were involuntarily terminated and the children were old enough to have already established bonds of affection with their grandparents. *See In re Benavidez,* 10 Ill.Dec. at 364, 367 N.E.2d at 973 (intervention in an involuntary termination action is "an entirely different matter" from intervention in a proceeding for a private adoption to which the parents have consented); *Kasper,* 815 P.2d at 749 (distinguishing cases involving involuntary termination of parental rights from cases where the parents have voluntarily relinquished their parental rights).

This case is also distinguishable from *In re Reed,* 468 N.W.2d 819, 825 (Iowa 1991), where the grandparents were given preference as adoptive parents because of their status as grandparents. In *Reed* the natural parents had died in a car accident. Consequently, that case did not involve a voluntary termination of parental rights such as we have here. *See Suster,* 858 S.W.2d at 124 (intervention of grandparent following termination of parental rights is distinguishable from intervention following the death of parent); *Muggenborg v. Kessler,* 630 P.2d 1276, 1278 (Okla.1981) (case involving adoption of child whose parents are deceased is "significantly different" from case where only living parent consents to adoption).

B. *Medical necessity.* Were the "substantially diminished" familial relationship the only basis for the grandparents' claim of interest here, we would affirm the dismissal

---

**2.** In 1986 the legislature enacted a statute giving grandparents visitation rights under circumstances where parental rights had been terminated pursuant to § 600A.9. 1986 Iowa Acts ch. 1123, § 1 (codified at Iowa Code § 600A.10 (1987)). This statute was repealed one year later. 1987 Iowa Acts ch. 159, § 10. This legislative action indicates the legislature's policy decision not to extend grandparents' rights to voluntary termination cases.

of their petition of intervention. However, the grandparents have alleged unique circumstances that may support a finding that it is in the best interest of the child that his grandparents be allowed to intervene.

Because B.B.M. may have Duchenne muscular dystrophy, the grandparents may be particularly suited to care for him and provide the opportunities only they can provide for treatment of his disease. Under the unique circumstances of this case, we hold that the interests of B.B.M. require that his grandparents be considered as possible guardians and custodians. Consequently, the grandparents are potentially interested parties and therefore, it was error for the court to dismiss their petition of intervention on a motion to dismiss.

III. *Disposition.*

It appears from the record that B.B.M. may now be old enough for testing to find out whether he, in fact, has Duchenne muscular dystrophy. Once this question has been resolved, the court may reconsider whether the grandparents have a sufficient interest to intervene.

If the child does not have DMD, the court must dismiss the grandparents' petition. If the child has DMD, then the court should decide whether the medical benefits, if any, to be obtained by the child from a grandparent adoption are sufficient to outweigh the benefits to the child and his natural parents of an independent adoption. We express no opinion on whether the grandparents should be appointed guardians and custodians or whether they should be allowed to adopt the child if he has DMD. These determinations must await a full presentation of evidence concerning the best interests of B.B.M. as well as the interests of his natural parents.

This case is reversed and remanded to the juvenile court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

All Justices concur except LARSON, J., who takes no part.