# IN THE COURT OF APPEALS OF IOWA

No. 25-0044
Filed August 6, 2025

IN THE INTEREST OF L.P.,
Minor Child,

STATE OF IOWA and W.D. and T.D.,
    Appellants,

D.S. and K.S.,
    Appellees.
_____

Appeal from the Iowa District Court for Polk County, Susan Cox, Judge.


The State and relative intervenors appeal orders in a child-welfare case.

**AFFIRMED.**


Brenna Bird, Attorney General, and Michelle R. Becker (argued), Assistant Attorney General, for appellant State.

Heidi Miller (argued) of The Law Office of Heidi Miller (until withdrawal), Pleasantville, for intervenors-appellants T.D. and W.D.

Teresa M. Pope (argued) of Pope Law, PLLC, Des Moines, for appellees K.S. and D.S.

Erin Romar of Youth Law Center, Des Moines, and Lynn Vogan (until withdrawal) of Juvenile Public Defender, Des Moines, attorneys and guardians ad litem for minor child.


Heard at oral argument by Tabor, C.J., and Schumacher and Langholz, JJ.

**TABOR, Chief Judge.**

Three families want to be placements for L.P., who was removed from parental custody as a newborn in November 2023. The juvenile court adjudicated L.P. as a child in need of assistance (CINA) in January 2024 and granted motions to intervene by both a potential relative placement and L.P.'s respite-care providers.[1] In December 2024, the court entered a CINA dispositional order finding that it was in L.P.'s best interests to be placed with the respite-care providers, identified by the court as fictive kin. The State appeals that order, as well as an order allowing the respite-care providers to intervene. The relative intervenors also appeal, challenging both placement with the fictive-kin intervenors and the denial of their request for concurrent jurisdiction. After our de novo review, we affirm the juvenile court's orders.

## I. Facts and Prior Proceedings

### A. Removal and initial placement

L.P.'s mother tested positive for opiates at the hospital before she gave birth to her daughter. The mother has a long history of substance use, mental-health concerns, and involvement with the Iowa Department of Health and Human Services. Her parental rights to four other children had been terminated. The department removed the newborn from parental custody.[2]

---

[1] The relative intervenors (W.D. and T.D.) live in Polk County and are the adoptive parents of L.P.'s teenage half-sibling. Another potential relative placement (M.D. and B.D.) live in Illinois; they are the adoptive parents to three other half-siblings of L.P. Those siblings were born in 2013, 2019, and 2020. That family did not move to intervene. The respite caregivers (K.S. and D.S.) are the appellees in this action. When the context allows, we refer to them as the fictive-kin intervenors.

[2] The juvenile court ordered paternity testing for a putative father, but his whereabouts remain unknown.

On November 20, 2023, the department placed L.P. in a foster home that was not a concurrent plan for adoption. Less than a week later, the foster family needed respite care for L.P. because they planned to travel out of state for Thanksgiving. A mutual friend connected the foster family with K.S. and D.S., who lived nearby. This couple agreed to furnish respite care for L.P., and the department approved the arrangement. Going forward, the respite caregivers also provided daycare for L.P. on weekdays. The department gave its approval for K.S. and D.S. to deliver ongoing care for L.P., including overnight respite care.

### B. Proceedings up to disposition

In mid-January 2024, when L.P. was about two months old, the respite caregivers learned that the department intended to move L.P. to a different foster home. They moved to intervene and to modify placement. The motion alleged they had "formed a relationship with [L.P.], essentially since she left the hospital, and have seen her, and provided care for her, nearly every day since." They wanted "to be considered for placement of [L.P.] and [were] willing to serve as a concurrent plan." The court held a hearing on the motion to intervene on January 29. On February 2, the court granted the motion, finding that the respite caregivers had developed a fictive-kin relationship with L.P. The court set the respite caregivers' motion to modify placement of L.P. for hearing on February 15.

Despite the mandate in Iowa Code section 232.84(2) (2023) to provide notice to adult relatives "within thirty days after the entry of an order . . . removing a child from the custody of a parent," the department did not notify W.D. and T.D.—the Polk County relative intervenors—until February 9, 2024 (eighty-one days from

the removal order) and did not notify M.D. and B.D.—the Illinois relatives—until February 29 (101 days from the removal order).[3]

The dispositional hearing began on February 15. First off, the State alerted the court that relatives, W.D. and T.D, were interested in being a placement for L.P. *See* Iowa Code § 232.2(56) (defining "relative" as "an individual related to a child within the fourth degree of consanguinity or affinity, by marriage, or through adoption," "includ[ing] the parent of a sibling of the child if the sibling's parent's parental rights were not previously terminated in relation to the child"). When those relatives moved to intervene, the court granted their motion.[4] The parties agreed to continue the hearing until April 11.

In early April, the department requested an expedited evaluation under the Interstate Compact on Placement of Children for M.D. and B.D.—L.P.'s relatives in Illinois. Given these developments, and with the agreement of the parties, the court again continued the dispositional hearing.

In May, the fictive-kin intervenors requested an attachment assessment by a licensed therapist, Erin Helleso. The State resisted, noting that the department was exploring relative placements and highlighting the cost of the assessment. The court granted the request, finding "[t]his is important information for the Court to consider and in the child's best interest." The State moved to reconsider. The

---

[3] The department social work case manager testified that she lacked access to the adoption records showing that L.P.'s half-siblings had been adopted by those two families. The case manager only identified those families after her supervisor suggested contacting an adoption worker in the department. The department sent its first relative notices a few days after the court approved the respite caregivers' motion to intervene.

[4] That order is not challenged on appeal.

court granted the State's motion, finding that reasonable efforts did not require that court-ordered funds be used for the assessment. The fictive-kin intervenors then moved to reconsider. On June 13, the court granted their motion to reconsider in part—the court ordered the department to "sign necessary consents" for L.P. to meet with Helleso but did not approve court-ordered services funds to pay for the assessment. But one month later, the department had not complied with that court order.

On July 12, the attorney general's office entered an appearance for the department. That same day, the department asked for four attachment assessments for L.P.'s placement—the relative intervenors, the fictive-kin intervenors, the Illinois relatives, and the current foster family. The court granted that request.

The dispositional hearing was continued several more times. The court ordered L.P. to have visitation with both relative families.

In mid-July, two department supervisors and the department caseworker held a staffing with an assistant attorney general, the guardian ad litem (GAL), and three therapists, including Helleso. Therapist Eileen Swoboda prepared a written summary of the staffing. That summary recommended that "only one mental health therapist" be identified to provide any further guidance to the court on the child's "development and growth."

In late July, the relative intervenors moved for concurrent jurisdiction, expressing their desire to open a guardianship for L.P. They asserted: "This would allow the child to potentially have permanency faster."

In August, the department withdrew its request for the four attachment assessments. Also in August, the State moved to "modify the placement level" so that L.P. could be moved to relative placement. To counter that move, the fictive-kin intervenors offered this opinion from therapist Helleso:

> Given L.P.'s age, the very limited level of a relationship she has with her biological half siblings, and the fact she has siblings in two different adoptive homes in two different states does not give priority to placement with a biological family member over healthy and securely established caregivers, [K.S. and D.S.].

## C. Disposition

The dispositional hearing took place over two days in November 2024, just shy of L.P.'s first birthday. At the hearing, the court also addressed two pending motions: the relative-intervenors' motion for concurrent jurisdiction and the State's motion to modify the level of placement. The court heard testimony from the department caseworker, the court-appointed special advocate (CASA), one of the fictive-kin intervenors, one of the relative intervenors, and therapist Helleso. Both intervenors asked to be placements for L.P. The department recommended placement in relative care. The county attorney maintained that placement with the fictive-kin intervenors was in L.P.'s best interests, reasoning, "I would agree that, typically, I do think it's in the child's best interest to be placed with family, but in this case and under these circumstances, I'm not sure that's the case." The GAL and CASA also supported L.P.'s placement with the fictive-kin intervenors.

The court entered a CINA dispositional order on December 27.[5] The court kept temporary legal custody of L.P. with the department and directed "fictive kin

---

[5] By this time, L.P.'s mother was not participating in services, and the department had not located her father.

placement—with [K.S. and D.S.]." The court denied the relative intervenors' motion for concurrent jurisdiction. The State and the relative intervenors separately appeal that order. They both contend that the juvenile court erred in placing L.P. with fictive kin when relative placements were available. The State also challenges the orders allowing fictive kin to intervene and granting the fictive-kin intervenors' request for an attachment assessment. The relative intervenors contest the denial of their request for concurrent jurisdiction. The fictive-kin intervenors defend the juvenile court's orders. The GAL and the county attorney join the fictive-kin intervenors' response.

## II.    Scope and Standards of Review

We review child-in-need-of-assistance proceedings de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). We give weight to the juvenile court's factual findings, but they do not bind us. *Id.* Our primary concern is the child's best interests. *Id.* We review the juvenile court's order on a motion to intervene "for correction of errors at law, giving some deference to the district court's discretion." *In re A.G.*, 558 N.W.2d 400, 403 (Iowa 1997). We liberally construe the intervention rule. *In re H.N.B.*, 619 N.W.2d 340, 343 (Iowa 2000).

## III.    Analysis

### A. Did the juvenile court properly allow "fictive kin" to intervene?

Before tackling the disposition issue, the State claims the juvenile court erred by granting the respite caregivers' motion to intervene ten months earlier. To begin, the State disputes that the respite caregivers met the definition of fictive kin. *See* Iowa Code § 232.2(22) (defining "fictive kin" as "an adult person who is

not a relative of a child but who has an emotionally positive significant relationship with the child or the child's family").

At the motion-to-intervene hearing, counsel for the respite caregivers made a professional statement that her clients—with the department's approval—began caring for L.P. when she was four days old. L.P. was the only child for whom they provided care, and they did so without compensation. The GAL also spoke in favor of intervention, explaining that L.P. had "spent probably a third of her very short life with the potential intervenors. I do think that's a substantial interest."

On appeal, the State contends that "there was no evidence to support a finding that the childcare providers shared an emotionally significant relationship with L.P." The State notes that at the removal hearing, "there was no mention of a relationship between L.P. and [K.S. and D.S.]." But about three weeks later, when L.P. was just seventy-three days old, the court found that they qualified as fictive kin. The State does not argue that a person's status as fictive kin must predate the child's removal from parental custody. Rather, its argument focuses on the lack of evidence before the juvenile court that the respite caregivers developed "an emotionally positive significant relationship" with L.P. after less than three months.

In response, the respite caregivers acknowledge that the State resisted their motion to intervene. But they assert that the State did not preserve error on its claim that they did not fit the definition of "fictive kin" in section 232.2(22).

That preservation issue is a close call. True, at the motion-to-intervene hearing, the State offered a professional statement from the department service area manager on this issue. She said the department "would not consider daycare

providers per se, fictive kin, to a child that is so, so young." But the department—then represented by the county attorney—agreed that the would-be intervenors had "a relationship with the child through daycare and being available to the child and caring for the child." And when asked whether the department believed it was necessary for the court "to receive evidence" on the fictive-kin question, the county attorney responded:

> I don't think that's necessary . . . . There's no dispute about what the facts are. Whether or not that being a daycare provider, being available to the child, expressing an interest in adopting the child long term, I mean, if that rises to that finding, then I think the court can make that.

On appeal, the department—now represented by the Iowa Attorney General—criticizes the juvenile court for finding that the intervenors were fictive kin "without hearing evidence and based only on the statements of counsel."

Because error preservation is based on fairness, we are troubled by the State taking a different position on appeal than it took in the juvenile court. *See DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002) (noting effort to protect trial courts from being "ambushed" by parties raising a new issue on appeal). But we assume that error is minimally preserved and consider the merits.

In its ruling, the juvenile court properly relied on the State's assent to the facts showing that the respite caregivers had a positive and significant relationship with L.P. Considering those facts, like the juvenile court, we find that their caregiving relationship with L.P. qualifies them as fictive kin. Our finding follows the GAL's nuanced position at the hearing: "[A] lot of times we have daycare providers, and that might not be a substantial interest in those cases. But in this case . . . it's different because we have a child [who's] so young." The respite

caregivers were not in-home daycare providers who enrolled L.P. in the course of their business. Rather, they offered daytime and overnight care for a newborn who, by all accounts, thrived in her early months. And as they point out on appeal, their formative connection with the infant soon after removal was "one of the only relationships L.P. had to that point."[6]

In evaluating these circumstances, we reject the State's implication that L.P. and the respite caregivers could not form an "emotionally positive significant relationship" in two and one-half months. *See In re J.B.*, 550 P.3d 333, 338 (Nev. 2024) (en banc) ("When deciding whether a nonrelated party can be designated as a child's fictive kin, the court should look for manifestations of care from the perspectives of both the prospective custodian and the child. In the case of an infant, analysis of fictive kin may be guided heavily or entirely by the bond the prospective custodian has with the child.").

Having found that the respite caregivers are fictive kin, we turn to whether they may intervene in this child-welfare case. "Iowa Rule of Civil Procedure 1.407 controls the right to intervene in a CINA action." *In re J.L.*, No. 24-2071, 2025 WL 863558, at *2 (Iowa Ct. App. Mar. 19, 2025). That rule allows intervention

> [w]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter

---

[6] As a back-up, the respite caregivers argue that if they weren't fictive kin, they could be described as "suitable other persons with a close relationship with L.P." *See* Iowa Code § 232.102(1)(a)(3) (providing for "[a]ny other suitable placement identified by the child's relatives"). Because the court found they were fictive kin, it did not address whether they were a "suitable placement."

impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Iowa R. Civ. P. 1.407(1)(b).

Would-be intervenors are "interested" within the rule's meaning if they have "a legal right that the proceeding will directly affect." *In re B.B.M.*, 514 N.W.2d 425, 427 (Iowa 1994). A juvenile court has discretion in deciding whether a would-be intervenor is "interested" in the litigation. *A.G.*, 558 N.W.2d at 403. But once the would-be intervenors show that they have a legal right satisfying the rule's prerequisites, the juvenile court lacks discretion to deny intervention. *Id*.

As we explained in *J.L.*, "[i]n Iowa Code section 232.102(1)(a) . . . the legislature extended certain categories of individuals a 'legal right' to be considered for custody in the CINA proceeding." 2025 WL 863558, at *2. Fictive kin is one of those categories. Like the juvenile court, we find that—as fictive kin—the respite caregivers had a statutory interest in L.P.'s placement during the CINA proceedings. *See A.G.,* 558 N.W.2d at 404. "In other words, having a legal right to be considered for custody makes one an interested party for the purposes for rule 1.407." *J.L*, 2025 WL 863558, at *2.

Beyond questioning the respite caregivers' legal right to intervene, the State contends that their interest was "adequately represented" by an existing party. *See* Iowa R. Civ. P. 1.407(1)(b). Indeed, the juvenile court equivocated on this point. On the one hand, the court noted in its February 2024 order granting intervention that the respite caregivers and the GAL (on behalf of L.P.) took the same position

"at this exact suspended moment in time."[7] On the other hand, the court worried that "tension" between the respite caregivers and the department could impede their ability to access necessary information.

On this second point, the State maintains that the juvenile court's description of "the nature of the relationship between the department and the childcare providers is neither supported by the evidence nor an appropriate basis upon which to allow intervention." To the contrary. The record backs the juvenile court's observation of tension between the department and the would-be intervenors. For example, at the motion-to-intervene hearing, the caseworker told the court that the respite caregivers were identified "outside of the department's communication. And we have a process that we follow. We don't try to subvert that process because there is code and process that is required for us to do our due diligence for placement." And we agree with the juvenile court that such tension was relevant to whether the would-be intervenors' interests were adequately represented by the existing parties. *See J.L.*, 2025 WL 863558, at *4 (noting department's resistance to fictive kin's attempt to intervene).

---

[7] At the motion-to-intervene hearing, the GAL addressed the possibility that her alignment could shift as the CINA case progressed:

> I think that the person who would have the closest position to potential intervenors would be myself as GAL. But I do think that today that we might be in agreement.
>
> When we get to the motion to modify and we get to other issues, we might not be, as my position will always be what I feel is in the best interest of [L.P.] and what is the safest, most appropriate option for her going forward, which, based on evidence that the department might present or the State might present, I might have to change my mind on what I believe is appropriate.

Finally, the juvenile court found that intervention was in L.P.'s best interests. Once the court properly determined that the would-be intervenors were interested parties for the purposes of rule 1.407, it lacked discretion to deny intervention. *A.G.*, 558 N.W.2d at 403; *see also In re Est. of DeVoss*, 474 N.W.2d 539, 541 (Iowa 1991) (discussing "intervention by right"). Our cases only require a separate determination that intervention is compatible with the child's best interests when intervention is permissive. *See, e.g., H.N.B.*, 619 N.W.2d at 343–44 (analyzing whether would-be intervenor was a "suitable person" in post-termination case); *In re M.M.*, No. 16-0335, 2016 WL 3002817, at *2 (Iowa Ct. App. May 25, 2016). But even assuming a separate best-interests finding is necessary here, we reach the same conclusion as the juvenile court.

On the question of delay, the county attorney told the court that the department's concern was that intervention "would be a further delay in getting this child permanency." But the county attorney clarified that the dispositional hearing would be pushed back by just sixteen or seventeen days. And the county attorney candidly noted that the department "had probably not managed this case the best" by placing L.P. in a foster home that was not a pre-adoptive option and allowing that foster family to seek out their own daycare providers. Given the minimal delay and the significant time that L.P. had spent with the respite caregivers, the GAL believed that intervention was in her best interests. On the facts before it, the juvenile court found that L.P.'s best interests were served by giving her primary caregivers a seat at the table. From our de novo review of the record, we agree.

**B. Did the court provide sufficient reasons for finding that placement with an adult relative was not in L.P.'s best interests?**

We turn next to the consequential issue of placement under Iowa Code section 232.102(1)(a). The State and the relative intervenors contend that the juvenile court erred by finding that placement with an adult relative was not in L.P.'s best interests.[8] The fictive-kin intervenors counter that the court's findings "were based on the documentary evidence and testimony presented at the disposition hearing" and maintain that "L.P.'s bond and attachment with [them] and her foster mother are significant. These are the primary bonds she has [had] for her entire first year of life[, whereas] L.P. has had limited contact with either identified relative."

Because L.P. could not be safely returned to her parents at the time of disposition, the legislature required the juvenile court to transfer her custody to the department for placement in a category identified by the court.

> After a dispositional hearing, . . . [i]f the court finds that custody with either of the child's parents is not in the child's best interests, the child's custody shall be transferred to the department for placement of the child in any of the following categories in the following order of priority:
> (1) An adult relative of the child including but not limited to adult siblings and parents of siblings.
> (2) A fictive kin.
> (3) Any other suitable placement identified by the child's relatives.
> (4) An individual licensed to provide foster care pursuant to chapter 237. If the child is placed with a licensed foster care

---

[8] The State and the relative intervenors frame the question around the least restrictive disposition language in Iowa Code section 232.99(4) ("When the dispositional hearing is concluded the court shall make the least restrictive disposition appropriate considering all the circumstances of the case. The dispositions which may be entered under this subchapter are listed in sections 232.100 through 232.102 in order from least to most restrictive."). But we focus on the best-interests inquiry.

provider, the department shall assign decision-making authority to the foster care provider for the purpose of applying the reasonable and prudent parent standard during the child's placement.

(5) A group care facility, shelter care facility, or other residential treatment facility.

Iowa Code § 232.102(1)(a).

If the court orders placement of the child in categories (2) through (5), it must make "a specific finding that placement with an adult relative is not in the child's best interests." *Id.* § 232.102(1)(c).

At the dispositional hearing, the court received evidence and arguments on which placement category would be in L.P.'s best interests. The department—represented by the attorney general—acknowledged, "I don't think anyone disputes that we have three perfectly appropriate, loving homes that could care for both the short- and the long-term needs of [L.P.]." But the department argued that placement with an adult relative—either the relative intervenors or the Illinois relatives—was in her best interests.

The county attorney took a contrary position, arguing "the specific facts" of this case supported a finding that relative placement was not in L.P.'s best interests. The county attorney pointed to the length of time that L.P. had been in the care of fictive kin and to the fictive kin's strong efforts to foster a relationship between L.P. and her siblings.

Likewise, the CASA believed that it was in L.P.'s best interests to stay with the fictive kin. "That will be the least disruption to her day-to-day life and how she's operating now." The CASA discussed the placement hierarchy:

I understand the general rule of family first, . . . but my frustration that I've felt in this case is every time any of the parties say she has to go to family, I keep thinking but at what harm to [L.P.]? . . . That just

uprooting her, even if it is a slow transition, would be the same as removing any other one-year-old from what they know all the time. . . . I'm not an expert in trauma or moving kids, but that is just my concern, that we're moving people because we think we have to, not because it's in her best interest or because it's reasonable.

So too the GAL. She echoed the importance of placing children with family but saw this case as a rare exception. On behalf of L.P., the GAL advocated for the court to find that relative placement was not in the child's best interests.

Iowa Code 232.102 does place that priority placement on relatives, and this court, and the parties in this room know that ninety-nine percent of the time I am a big proponent of family and relative placement, because I truly believe that in most cases that's what is in the best interest of the child.

But here, the GAL stressed "the attachment that we all know that she shares with her current caregivers" and "the trauma of an additional removal."

The juvenile court embraced the position of the GAL, the fictive-kin intervenors, the CASA, and the county attorney. Complying with section 232.102(1)(c), the court made a specific finding that placement with relatives would not be in L.P.'s best interests, reasoning:

For over one year, [L.P.] has been in a close, supportive family type relationship with [the fictive kin] and her foster family. The families have worked together in a family like unit to support and care for [L.P.]. [L.P.] is attached to [the fictive kin] family. [They are] her primary parent relationship. When [they] leave a room, [L.P.] looks for them. [L.P.] sustained a trauma when removed from her mother at birth. Moving [L.P.] away from [the fictive kin] and her foster family would be significant second and third traumas for the child. [The fictive kin] have demonstrated that they can work with [L.P.]'s relatives and support their relationship. Also, [L.P.] has received quality services through the STAR Center. The court shares the CASA's concerns re disrupting that care. [L.P.] has established her home. If the court disrupts [L.P.]'s life with [the fictive kin] and extended family like relationship with her foster family, then the court believes the little girl will suffer a trauma wound that will always haunt her.

The court also expressed concern about whether the relative placements would support ongoing relationships with the fictive kin or even L.P.'s other half-siblings. The court noted that L.P.'s half-siblings in Illinois and in the relative intervenors' home did not have "contact with each other between 2019 and 2024." The court also observed that the relative intervenors failed to include L.P.'s fictive kin in communications or provide information, unlike the fictive kin who routinely updated all the interested parties.[9]

On appeal, the State contests the juvenile court's rationale for choosing fictive kin over the category of adult relatives. In the State's view,

> the juvenile court treated the disposition in this matter like a custody battle, using the best interest standard to select the court's preferred placement for L.P. rather than employing the best interest standard to select the least restrictive placement category appropriate for L.P. based on the circumstances as the law requires.

In support of its argument for distinct best-interests standards, the State cites a special concurrence in an unpublished post-termination adoption case. *See In re J.H.*, No. 20-0081, 2020 WL 2988758, at *9 (Iowa Ct. App. June 3, 2020) (Ahlers, J., specially concurring) (differentiating between best-interests-of-the-child standard in a divorce action from best-interests standard in a child-welfare case).

At oral argument, the State went even further, arguing that the phrase "best interests" means something different in section 232.102(1)(c) than it does in section 232.116(2), which addresses termination of parents' rights. The State reads section 232.102(1)(c) to mean, in essence, that if the department identifies

---

[9] The relative intervenors acknowledged that the fictive-kin intervenors sent updates on L.P. "fairly regularly," including "pictures every week, week and a half, sometimes a video here and there."

a suitable adult relative for placement, game over. Under the State's interpretation, the juvenile court cannot make a comparison between the suitable adult relative and categories (2) through (5) when deciding the preferred placement for a child.

We reject the State's interpretation. First, we presume that the legislature intended "best interests" to bear the same meaning throughout chapter 232 absent evidence from the context that a different construction was intended.[10] *See B.A.A. v. Chief Med. Officer, U. of Iowa Hosps.*, 421 N.W.2d 118, 125 (Iowa 1988) ("[W]hen identical language is used in several places in an enactment, we ordinarily give it the same meaning."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (2012) (discussing presumption-of-consistent-usage canon). Applying that principle, we find that the best-interests framework in section 232.116(2) may guide the juvenile court's best-interests finding under section 232.102(1)(c).

Second, it would be impossible for a juvenile court to explain its decision to order that a child be placed in category (2), (3), (4), or (5) under section 232.102(1)(a) rather than with an adult relative without comparing how each setting would ensure the child's safety and address the child's physical, mental, and emotional condition and needs. For instance, perhaps a child has a suitable adult

---

[10] At oral argument, the State pointed out that our court construed the phrase "failed to act in the child's best interests" in section 232.102(1)(b)(2) as "distinct from other best-interests formulations within chapter 232, *see, e.g.*, [Iowa Code] § 232.116(2), placing more focus on the Department's processes and giving it greater deference than the juvenile court's order did here." *Iowa Dep't of Health & Hum. Servs. v. Iowa Dist. Ct. for Polk Cnty.*, No. 24-0834, 2025 WL 548012, at *5 (Iowa Ct. App. Feb. 19, 2025) (further review pending). But the question here is not whether the department acted "unreasonably or irresponsibly" under section 232.102(1)(b)(2). So the focus is not on the department's processes but on the court's reasons for choosing a placement category.

relative but their needs and interests are best served within the structure of a group-care or residential-treatment facility.

When the choice is placement with fictive kin over an adult relative, the department has recognized that "[b]iological ties are not the only ties that are important." *In re C.F.*, No. 23-1552, 2024 WL 1552595, at *1 (Iowa Ct. App. Apr. 10, 2024). In *C.F.*, the juvenile court found that changing placement to the maternal grandmother was not in the children's best interests. *Id.*; *see also* Iowa Code § 232.102(1)(c). Among the court's reasons was that "a disruption in placement" undermined the children's best interests because they were bonded to their fictive-kin caretaker. *C.F.*, 2024 WL 1552595, at *4.

The same is true here. The juvenile court reasoned that L.P. had "established a primary attachment relationship" with the fictive-kin intervenors. As the court found, their relationship "grew and deepened" because the department was slow in notifying relatives of the removal. In explaining why placement with the adult relatives was not in L.P.'s best interests, the court focused on the trauma she would experience being removed from the fictive kin. As for the adult relatives eventually identified by the department, they were related not by blood, marriage, or any other close connection, but by adopting L.P.'s half-siblings. Yet those relatives had not maintained communication among the siblings. As the court noted, "The children went five years without contact." And as the court reasoned, the fictive kin were more committed to fostering those connections.[11]

---

[11] On appeal, the relative intervenors assert: "L.P. has the best chance of maintaining contact with all the families who love and cherish her" if placed with them. But their track record belies that assertion.

In our de novo review of best interests, we reach the same conclusion as the juvenile court. In affirming the juvenile court's dispositional ruling, we do not underestimate the value of maintaining family ties for children who cannot be safely returned to their parents' custody. *See generally* Leonard Edwards, *Relative Placement: The Best Answer for Our Foster Care System*, 69 Juv. & Fam. Ct. J. 55, 58 (2018) (noting relative placement is best practice and often minimizes trauma). But when we consider all the circumstances of L.P.'s case, we find that placement with an adult relative was not in her best interests given the bond that she had developed with the fictive-kin intervenors and their commitment to fostering the sibling relationships.

### C. Did the department act unreasonably or irresponsibly?

The State contends the court erred "by selecting a specific placement for L.P. by using Iowa Code section 232.102(1)(b)(2) to find the Department acted unreasonably or irresponsibly." The State claims that the court "preemptively and *sua sponte* employed this standard to circumvent the clear statutory mandates and select a specific placement for L.P."

In their petition on appeal, the relative intervenors first contend that the juvenile court correctly found that the department acted unreasonably in failing to timely provide relative notices.[12] But they do not fully support the dispositional

---

[12] At the disposition hearing, the relative intervenors argued that the department acted unreasonably in choosing the Illinois relative placement over them. The State responded to the "unreasonableness argument" by arguing that the department acted reasonably in its efforts to find L.P.'s relatives but were hindered by the confidentiality of adoption records.

order. They contend the juvenile court erred in determining placement with fictive kin was in L.P.'s best interests.

In their response to the petition on appeal, the fictive-kin intervenors contend that "[a] finding that the Department acted 'unreasonably or irresponsibly' is not required here as it would be for another party to challenge the Department's specific placement within the same category, such as the Department choosing between two individuals who have both been identified as fictive kin." We agree that the court's finding under section 232.102(1)(b)(2) was unnecessary. We disregard that finding in affirming the dispositional order. The order properly directed L.P.'s placement with "fictive kin" in compliance with section 232.102(1)(a)(2) and (1)(c). *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012) ("[W]e may affirm the juvenile court's order on any ground we find supported by the record.").

**D. Did the court err in denying concurrent jurisdiction?**

The relative intervenors also challenge the court's denial of their motion for concurrent jurisdiction. They claim permanency for L.P. "has already been significantly delayed because of the actions of the [department]" and insist that the "quickest way to ensure permanency" is to grant concurrent jurisdiction so that they can pursue a guardianship.

During a CINA case, "a party to the action is estopped from litigating concurrently the custody, guardianship, or placement of a child who is the subject of the action, in a court other than the juvenile court." Iowa Code § 232.3(1). But the juvenile court may allow a party "to litigate concurrently in another court a

specific issue relating to the custody, guardianship, or placement of the child who is the subject of the action." *Id.* § 232.3(2).

In July 2024, the relative intervenors moved for concurrent jurisdiction. They alleged that multiple families were requesting placement of this child, dispositional and permanency hearings were months away, and concurrent jurisdiction would allow them to request a guardianship for L.P—allowing her to "potentially have permanency faster."

The court considered the motion at the dispositional hearing in November. The relative intervenors argued that if the motion was granted, they would file a separate guardianship case and "it would ultimately be [their] intention to adopt" L.P. The court denied the motion, reasoning, "Having a separate legal proceeding for guardianship would not be in [L.P.]'s best interest, at this time. The next scheduled hearing for [L.P.] is the permanency hearing. One of the permanency options is guardianship."

The juvenile court has exclusive jurisdiction over the custody and placement of a child in CINA proceedings. *In re A.C.*, No. 24-0435, 2024 WL 2842230, at *4 (Iowa Ct. App. June 5, 2024). It also has discretion to authorize concurrent jurisdiction, but it must exercise that discretion in the child's best interests. *Id.* We find no abuse of that discretion here. The record lacks any evidence that concurrent jurisdiction would expedite permanency for L.P.

**E. Did the State properly raise its challenge to the court order for an attachment assessment requested by the fictive-kin intervenors?**

When setting out the procedural background in its petition on appeal, the State mentions the juvenile court order granting a request by the fictive-kin

intervenors for an attachment assessment. In a footnote, the State cites the back-and-forth motions and court orders and then asserts: "The State challenges the juvenile court order for this service." But the only other reference appears in the State's argument that it did not act unreasonably in requesting its own attachment assessments and then resisting the use of attachment assessments. The fictive-kin intervenors do not respond to this issue.

Because the State did not sufficiently present the issue, we decline to address the propriety of the court's order for an attachment assessment. "[S]prinkled mentions of an issue" do not properly raise a claim for our consideration. *In re J.R.*, No. 22-1470, 2023 WL 2148760, at *3 (Iowa Ct. App. Feb. 22, 2023).

## IV. Conclusion

To recap, we affirm the juvenile court order allowing the fictive-kin intervention. We also affirm the dispositional order placing L.P. with the fictive-kin intervenors—without considering whether the department acted unreasonably. And we affirm the denial of the relative intervenors' request for concurrent jurisdiction. Finally, we do not consider whether the court properly ordered an attachment assessment for L.P.

**AFFIRMED.**

Langholz, J., concurs; Schumacher, J., concurs in part and dissents in part.

**SCHUMACHER, Judge** (concurring in part and dissenting in part).

"The foster care system is designed to provide temporary, not permanent, homes for children. This is to facilitate the goals of reunification with the parents or placement in a relative's home." *In re E.G.*, 745 N.W.2d 741, 744 (Iowa Ct. App. 2007). With this guidance, I join with the majority in affirming the district court's denial of the intervenor's motion for concurrent jurisdiction, the portion of the majority's opinion which finds the State's claim on the attachment survey to be waived, and the conclusion that the district court's analysis under Iowa Code section 232.102(1)(b)(2) was unnecessary. But I respectfully dissent from the majority opinion as to the motion to intervene by the respite-care providers and the portion of the dispositional order which placed L.P with the respite-care providers instead of a relative placement.

The State claims the court erred by granting the respite-care providers' motion to intervene. The State contends the court erred in finding that the respite-care providers were fictive kin to L.P. as there was no evidence to support a finding that they shared an emotionally positive significant relationship with L.P. The respite-care providers counter that the State failed to preserve error on this claim because it "took no position as it relates to the [respite-care providers] being considered 'fictive kin.'" Like the majority, I disagree with this preservation argument. At the hearing on the motion, the State maintained it "would resist the motion to intervene at this time." And the State added, "But even if they were to intervene, I don't think that they can protect that interest of placement."

Motions to intervene are allowed in child-in-need-of-assistance (CINA) proceedings. *In re A.G.*, 558 N.W.2d 400, 402–03 (Iowa 1997). Under Iowa Rule of Civil Procedure 1.407(1)(b),

> [u]pon timely application, anyone shall be permitted to intervene in an action . . . [w]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

"The district court is allowed a certain amount of discretion in determining whether a proposed intervenor is 'interested' in the litigation." *In re W.A.*, No. 17-1178, 2017 WL 4570533, at *2 (Iowa Ct. App. Oct. 11, 2017). Courts "consider statutory guidance in determining whether a person has a right to intervene." *In re J.H.*, No. 12-1809, 2012 WL 6190296, at *2 (Iowa Ct. App. Dec. 12, 2012).

Let's begin with a question. What right is being claimed? In determining whether an applicant has a legal interest, we examine the source of the right claimed. *A.G.*, 558 N.W.2d at 403. An indirect, speculative, or remote interest will not provide one a right to intervene. *Id.*; *see also* 59 Am. Jur. 2d *Parties* § 134, at 591–92 (1987) (stating to have an interest in an action, a person must assert more than a mere general interest in the subject matter of the litigation); 67A C.J.S. *Parties* § 75, at 815 (1978) (same). Thus, the mere interest or desire to adopt a child will not qualify as a sufficient interest. *In re B.B.M.*, 514 N.W.2d 425, 427 (Iowa 1994) (noting that if such an interest were found sufficient, an unlimited number of people would be entitled to intervene); *In re C.L.C.*, 479 N.W.2d 340, 344 (Iowa Ct. App. 1991) (same). Statutes often provide the best guidance in determining who possesses the right to intervene. 59 Am. Jur. 2d *Parties* § 133,

at 587 (noting "[t]he right of intervention depends largely on the construction of the particular statute or rule under consideration"); *see also A.G.*, 558 N.W.2d at 403 (observing a statute may support right to intervention if the right will be directly affected by the outcome of the suit); *In re H.N.B.*, 619 N.W.2d 340, 343 (Iowa 2000). I conclude the respite-care providers did not demonstrate a legal interest sufficient to intervene.

The respite-care providers asserted a legal right to intervene as "fictive kin."[13] *See* Iowa Code § 232.102(1)(a)(2) (providing for placement with "[a] fictive kin"). "'[F]ictive kin' means an adult person who is not a relative of a child but who has an emotionally positive significant relationship with the child or the child's family." *Id.* § 232.2(22). The court determined that the respite caregivers met this definition. As the court explained:

> On November 20, 2023, [three days after L.P.'s birth,] the State requested the Court remove [L.P.] from the parents' custody. The Court granted the request and placed [L.P.] in the custody of HHS for purposes of foster care. HHS placed [L.P.] in a foster home which was not a concurrent plan for adoption. Approximately one day after placement, the foster home had [the respite-care providers], the requested intervenors, provide respite care for [L.P.]. [The respite-care providers] have continued to regularly provide respite care for [L.P.], without payment. Also, [the respite-care providers] have provided daycare for [L.P.], Monday through Friday, which has also been unpaid. [L.P.] is the only child in the [respite-providers'] home, for daycare. HHS was aware of [the respite-care providers'] substantial care providing responsibilities for [L.P.]. There is no dispute that [L.P.] has spent [approxomiately] 1/3 of her life, being taken care of by [the respite-care providers].
> . . . . The Court believes [the respite-care providers] have developed a "fictive kin" type of relationship with [L.P.]. . . . [The

---

[13] Alternatively, the respite-care providers asserted a legal right to intervene as "suitable others." *See* Iowa Code § 232.102(1)(a)(3) (2023) (providing for "[a]ny other suitable placement identified by the child's relatives"). Because the court found the respite-care providers shared a fictive-kin relationship with L.P., it did not address whether they were a "suitable placement."

respite-care providers] are not merely respite or daycare providers but meet the statutory definition of fictive kin. They obviously deeply care for the baby. HHS was aware of the circumstances surrounding this developing connection. The Court understands HHS may be frustrated re the intervenors not following the standard sequential steps to become foster parents, but that does not dissipate [the respite-care providers'] significant fictive kin relationship to [L.P.].

The State's challenge focuses in part on the fact that L.P. was seventy-three days old when the court granted the respite-care providers' motion to intervene. At the hearing on the motion,[14] the county attorney acknowledged the respite-care providers' relatively significant relationship with L.P. despite the child's young age, stating, "certainly I don't think there's a dispute about what the facts are and how long [L.P.] has known [the respite-care providers] and the care that they provide." The respite-care providers' attorney stated they had "started the home study process for the department" to be considered a concurrent placement for the child. *See A.G.*, 558 N.W.2d at 403 ("[A] statutory right *will* support intervention, provided that right will be directly affected by the subject litigation."). The guardian ad litem (GAL) was "in agreement with intervention" by the respite-care providers and opined the motion had been filed as soon as possible under the circumstances. *See In re S.C.*, No. 21-0044, 2021 WL 3074339, at *3 (Iowa Ct. App. July 21, 2021) (noting the opinion of a caseworker regarding the prospective intervenors' "close relationship with the child" and the timeliness of the filing).

But the relationship between the respite-care providers and L.P. was non-existent before the removal. The relationship developed only after the department was involved, like every potential foster care placement that provides meaningful

---

[14] No witnesses were called at this hearing.

care to Iowa's most vulnerable children.  Under the district court's analysis, nearly every foster parent could become fictive kin and be permitted party status.  And as the district court acknowledged, the position of the respite-care providers was aligned with the GAL at the time of the motion.  Their position was "adequately represented by existing parties."  *See* Iowa R. Civ. P. 1.407(1)(b).  The court district court agreed:

> The Court cannot find the strict requirements of this rule have been met. [L.P.] is a young baby.  The timelines for permanency will move very quickly.  It does not appear the mother is engaging in services.  The Court believes for the respite/daycare [respite-care providers' interest to be adequately represented, the Court must allow them to intervene and be notified/engaged in all matters of the case including staffings. Then, with that information, respite/daycare [respite-care providers] can consult with their own attorney and make strategic choices.  The GAL and the respite/daycare [respite-care providers'] interest may be the same, at this exact suspended moment in time, but that is not what the rule requires to prohibit intervention.  The Court also notes there is considerable tension between [the respite-care providers] and HHS representatives.  This is a further indication re the need for [the respite-care providers] to be allowed to intervene and have access to information surrounding the case and the ability to present information to the Court.

Finally, and importantly, "[t]he intervention must be compatible with the child's best interest."  *H.N.B.*, 619 N.W.2d at 344.  The court found that L.P., "as a baby, knows [the respite-care providers] as safe care providers."  *See In re M.M.*, No. 16-0335, 2016 WL 3002817, at *2 (Iowa Ct. App. May 25, 2016) ("[I]n determining whether to allow a party to intervene, 'the focus must always include the welfare and best interests of the child.'" (citation omitted)).  The court further found that "[i]ntervention will not delay the proceedings."  *But see W.A.*, 2017 WL 4570533, at *3 ("Allowing [the child's grandmother] to intervene at this point in the case, well after termination and at a time when one of the relevant children is ready

to be adopted and the other two are in need of permanency, would be detrimental to the children's best interests."). Although this case was not at termination, the battle between placements has significantly delayed permanency for L.P.

And our court has previously highlighted the rationale behind the temporary nature of the foster care system:

> This is to facilitate the goals of reunification with the parents or placement in a relative's home. We certainly recognize the bond that is developed between a foster parent and child. We also recognize that a bond between the foster parents and the child signifies a good foster home. However, if every foster parent who formed a bond with a child were given enforceable rights to the children, it would upset the goals of the system.

*E.G.*, 745 N.W.2d at 744.

As noted, the disposition occurred just shy of L.P.'s first birthday, nearly a year after removal. The goals of the system were upset by the involvement of the respite-care providers. For the above reasons, I would reverse the court's order granting the respite-care providers' motion to intervene.

The State and intervenors also claim the court erred by finding that placement with respite-care providers is the least restrictive disposition appropriate. *See* Iowa Code § 232.99(4) (stating that following the dispositional hearing, "the court shall make the least restrictive disposition appropriate considering all the circumstances of the case"). Specifically, the State and intervenors claim the court erred by ordering L.P.'s placement with fictive kin rather than relatives. Intervenors counter that the court's findings "were based on the documentary evidence and testimony presented at the disposition hearing" and maintain that L.P.'s bond and attachment with [the respite-care providers] and her foster mother are significant.

Section 232.102(1)(a) sets out the hierarchy for placement of children removed from their parents:

> After a dispositional hearing, the court may enter an order transferring the legal custody of the child to the parent of the child. If the court finds that custody with either of the child's parents is not in the child's best interests, the child's custody shall be transferred to the department for placement of the child in any of the following categories in the following order of priority:
> (1) An adult relative of the child including but not limited to adult siblings and parents of siblings.
> (2) Fictive kin.
> (3) Any other suitable placement identified by the child's relatives.
> (4) An individual licensed to provide foster care pursuant to chapter 237. If the child is placed with a licensed foster care provider, the department shall assign decision-making authority to the foster care provider for the purpose of applying the reasonable and prudent parent standard during the child's placement.
> (5) A group care facility, shelter care facility, or other residential treatment facility.

*Id.* § 232.102(1)(a). If the court identifies categories (2) through (5) as the preferred placement for a child, it must make a specific finding that placement with an adult relative is not in the child's best interests. *Id.* § 232.102(1)(c).

At the dispositional hearing, the court received evidence and arguments as to which placement category would be the least restrictive. HHS acknowledged, "I don't think anyone disputes that we have three perfectly appropriate, loving homes that could care for both the short- and the long-term needs of [L.P.]." However, the department argued the least restrictive placement was "with an adult relative"—Intervenors or the [Illinois relative family].[15] The respite-care providers and GAL requested placement of L.P. with the respite-care providers as fictive kin.

---

[15] The department recommended placement with the Illinois relative family as its first choice, but alternatively, with the intervenors.

Under section 232.102(1)(c), the court made a specific finding that placement with relatives would not be in L.P.'s best interests and provided reasons for its finding. The court stated:

> The court specifically finds relative placement is not in [L.P.]'s best interest. For over one year, [L.P.] has been in a close, supportive family type relationship with the family and her foster family. The families have worked together in a family like unit to support and care for [L.P.]. [L.P.] is attached to the [respite-care providers]. [The respite-care providers are] her primary parent relationship. When [one of the respite-care providers] leaves a room, [L.P.] looks for them. [L.P.] sustained a trauma when removed from her mother at birth. Moving [L.P.] away from the [respite-care providers] and her foster family would be significant second and third traumas, for the child. [The respite-care providers] have demonstrated that they can work with [L.P.]'s relatives and support their relationship. Also, [L.P.] has received quality services through the STAR Center. The court shares the CASA's concerns re disrupting that care. [L.P.] has established her home. If the court disrupts [L.P.]'s life with [the respite-care providers] and extended family like relationship with her foster family, then the court believes the little girl will suffer a trauma wound that will always haunt her.

The court also found if L.P. was "not placed in [the respite-care providers]' home, then she will spend the rest of her life looking for them and her foster family either literally or figuratively." The court expressed concern whether the relative placements would support contact with the respite-care providers, L.P.'s foster family, or even L.P.'s other half-siblings. The court noted that L.P.'s half-siblings with the intervenors and the relative home in Illinois had not had "contact with each other between 2019 and 2024." The court also observed Intervenors failed to include the L.P.'s caregivers in communications or provide information, whereas the respite-care providers routinely shared updates with all the interested parties.

In this de novo review of this issue, noting that all three identified homes were determined to be appropriate, I would reverse the dispositional order that

concluded placement with the respite-care providers was the least restrictive placement available. This is in accordance with the statutory preferences outlined by our legislature. All individuals involved deserve to be commended for their commitment to this child. It is rare for us, as a reviewing court in child-welfare matters, to encounter a situation where there are three appropriate homes. But we do not "underestimate the value of maintaining family ties for children who cannot be safely in their parents' custody." *In re C.F.*, No. 23-1552, 2024 WL 1552595, at *4 (Iowa Ct. App. Apr. 10, 2024) (citing Leonard Edwards, *Relative Placement: The Best Answer for Our Foster Care System*, 69 Juv. & Fam. Ct. J. 55, 58 (2018) (noting relative placement often minimizes trauma and is now considered best practice)).

Based on this record, the preference for relative placement should be followed. I would reverse the court's dispositional order which granted the respite-care providers' motion to modify placement.